KAREN LECRAFT HENDERSON, Circuit Judge,
dissenting.
The majority has decided to remand this case to the Board because it ultimately concludes that it “do[es] not know what to make of the Board’s decision.” Maj. op. at 312. This, after six pages meticulously *313 detailing the inadequacies of that decision. See id. at 309 (“The Board’s claim is disingenuous.”); id. at 310 (“These arguments [of the Board] are red herrings.”); id. at 311 (“In short, the three reasons relied upon by the Board to justify its finding that the General Counsel met its burden under the first prong of Wright Line are not supported by substantial evidence.”); id. at 311 (The Board “fail[s] to meet the necessary threshold to support a conclusion that antiunion animus was a motivating factor in Hydorn’s discharge.”); id. at 311 (“[T]he Board’s decision does not present substantial evidence ... In this circumstance, we would normally reverse the Board’s decision, because the reasons given by the Board do not support the result reached.”). But it earlier correctly characterized the Board’s order, namely “the Board misfired.” Id. at 312. In other words, the Board’s decision is wrong. When that happens, our duty is to grant the petition for review pure and simple. We have no warrant to allow an agency to patch the holes in an insufficient order, much less to “amplify ... as necessary on remand,” id., the “substantive validity” of its critical finding, id. While in certain limited circumstances we have remanded to an agency for further action, never have we done so where, as here, the majority itself categorically denounces the sufficiency of the order under review. C.f. Lee Lumber & Bldg. Material Corp. v. NLRB, 117 F.3d 1454, 1460 (D.C.Cir.1997) (on remand for failure to explain departure from its standard, Board had choice to vacate order or explain why order was necessary given facts of case). Because the Board’s decision is not supported by substantial evidence, as the majority acknowledges, see maj. op. at 311 (“[T]he Board’s decision does not present substantial evidence to support the conclusion that Hydorn’s protected conduct was a motivating factor in his discharge.”), I would grant Detroit News’s petition for review. Accordingly, I respectfully dissent.
The Board order plainly did not consider evidence of disparate treatment during the first step of the Wright Line analysis; “Thus, at least as written, the Board’s decision does not present substantial evidence to support the conclusion that Hy-dorn’s protected conduct was a motivating factor in his discharge.” Id. (emphasis in original).' My colleagues, however, do not take the Board at its word and instead uncover ambiguity from two sentences in the Board’s 5,000 word opinion. To them, the Board’s general observation that “evidence of a ‘blatant disparity is sufficient to support a prima facie case of discrimination,’ ” ' coupled with one sentence in its discussion of Wright Line step two, renders the Board order “not sufficiently clear to allow for meaningful review.” Id. at 312. In so concluding, they accept the Board’s post hoc rationalization for its analytically flawed decision.
No principle is better-settled in administrative law than that we are to uphold an agency order based only on reasoning fairly stated by the agency in the order under review. See SEC v. Chenery Corp., 318 U.S. 80, 88, 63 S.Ct. 454, 87 L.Ed. 626 (1943). “[P]ost hoc rationalizations by agency counsel will not suffice.” W. Union Corp. v. FCC, 856 F.2d 315, 318 (D.C.Cir.1988). Unlike a district court’s decision, that of an administrative agency cannot be sustained on a ground the agency did not consider — the agency’s decision must stand or fall upon its reasoning. See Ind. Hosp., Inc. v. NLRB, 10 F.3d 151,155 (3d Cir.1993); NLRB v. P*I*E Nationwide, Inc., 923 F.2d 506, 517-18 (7th Cir. 1991).
Here, the Board’s reasoning did not rely on evidence of disparate treatment. It discussed only three factors in its Wright Line step one analysis: (1) Hydorn’s ter *314 mination occurred against a backdrop of anti-striker animus; (2) the Company’s stated reason for Hydorn’s discharge was false; and (3) the Company failed to follow its own investigative and disciplinary procedures. Detroit Newspaper Agency, 342 N.L.R.B. No. 125, slip op. at 4-5, 2004 WL 2203014 (2004). That its finding of a pri-ma facie case was not based on evidence of disparate treatment is further supported by its summary of the prima facie case, from which, again, any mention of disparate treatment is conspicuous by its absence. Furthermore, the General Counsel presented no evidence of disparate treatment in litigating the prima facie case before the ALJ.[1]
I fail to see how the majority discerns ambiguity from the two sentences it cites in light of the Board’s unambiguously articulated justifications for its Wright Line step one finding, id., whether the sentences are viewed in isolation or taken together. The first sentence contains a reference to disparate treatment in an introductory paragraph listing various components of the prima facie showing. Id. at 304. In isolation, it is classic boilerplate; and, when coupled with the second sentence that appeal's in the Board’s discussion of disparate treatment evidence in step two, it still does not support the conclusion that the Board considered it as part of the prima facie showing. Detroit News rebutted the General Counsel’s pri-ma facie case with evidence of six nonstriking employees it also terminated for insubordination. Id. at 305-306. The Board rejected the Company’s rebuttal, noting that “we are unable to conclude from the Respondent’s evidence that it evaluated Hydorn’s misconduct according to the same standard applied to employees who did not engage in protected activities.” Id. at 305. Following this sentence, the Board discussed the General Counsel’s disparate treatment evidence. Id. It ultimately concluded that Detroit News “had a relatively lax attitude towards insubordination by non-strikers, even those who defied multiple direct orders or had been insubordinate on prior occasions.” Id. The Board did not relate this evidence to the prima facie case but instead to the step two analysis, which makes complete sense in relation to the Company’s rebuttal.
Even assuming the Board’s discussion of disparate treatment could properly be considered as having been directed to the prima facie showing stage, that showing would nonetheless be unsupported by substantial evidence. The record reveals that, at worst, Detroit News was inconsistent in disciplining insubordinate employees; more accurately, it manifests that Hydorn was treated no differently from non-strikers who engaged in behavior as high-handed as Hydorn’s. According to the Board, the General Counsel produced evidence that, between February 1997 and November 1999, the Company “disciplined 37 non-strikers for insubordination less harshly than Hydorn.” Id. The difficulty with the Board’s conclusion is that it assumed all types of insubordination are alike.[2] While in 20 of the 37 instances, Detroit News simply reprimanded the employee, nearly one-half involved employees who filed paperwork late and another two *315 involved employees who would not work overtime. The Board emphasized the fact that the other 17 employees were suspended — not terminated — but it omitted to mention that there were strikers who had also been suspended — not terminated — for insubordination. Id. In fact, from 1997 to 1999, seven employees in all were terminated for insubordination. Id. Only one was a returning striker and that was Hy-dorn.
The Board discounted this evidence, claiming that five of the six incidents involved termination for more than a single act of insubordination. Id. But, as the dissenting Board member convincingly explained, the conduct of two ww-strikers was on par with Hydorn’s. Id. at 308. The discharge letter sent to non-striker Sylvia Dean referenced only one incident when she “refused to follow the instructions of ... [her] supervisor ] and perform the work on the machine assigned to [her].” Id., Detroit News’s concern was the same with Dean as it was with Hy-dorn: “it appears from the foregoing that you are not willing to meet the duties, responsibilities and proper conduct required of you in your job.” J.A. 129. The Board distinguished the discharge of non-striker Usman Daramay because he was terminated for both refusal to obey, an order and “inappropriate behavior.” Apparently, Daramay’s “inappropriate behavior” was the “additional” factor that contributed to the Company’s termination decision. It is undisputed that Hydorn was guilty of “inappropriate behavior” too. Indeed, even Hydorn admitted that he had a “bad attitude.” Detroit Newspaper Agency, 342 N.L.R.B. No. 125, slip op. at 2. Because Hydorn’s attitude was not separately 'listed in the discharge letter, however, the Board found the two cases distinguishable. Nevertheless, as the record indicates, see J.A. 665-66, Taylor considered Hydorn’s attitude as well as the written statements of Leach and Monroig in deciding to fire him.[3]
The majority’s decision to remand this case to the Board “for elaboration” skirts decades of case law declaring that we can uphold an agency decision only upon the articulated rationale of the agency. I believe that the Board in fact articulated its rationale and that rationale is not supported by substantial evidence. Because I would grant the Company’s petition for review, I respectfully dissent.[4]

. In addition, the General Counsel did not allege disparate treatment in the complaint. See J.A. 47-51.

. The dissenting Board member reminded his colleagues of their limited ability to evaluate workplace imbroglios after the fact: "However, it is not our place to second-guess personnel decisions; our sole responsibility is to determine whether the General Counsel has established by a preponderance of the evidence that discriminatory animus was a substantial or motivating factor in tire challenged disciplinary action.” Detroit Newspaper Agency, 342 N.L.R.B. No. 125, slip op. at 7 (Schaumber, Member, dissenting) (2004).

. Taylor testified that he .took into account Hydorn's "attitude,” which was "[g]o ahead and fire me. Because I am not going to [clear paper drags] today and I am not going to do it tomorrow.” J.A. 665. See Detroit Newspaper Agency, 342 N.L.R.B. No. 125,. slip op. at 11 (Schaumber, Member, dissenting) ("No one can reasonably dispute that Hydorn engaged in conduct Respondent deemed 'inappropriate' in the course of his refusal to clear paper drags. Nor can one reasonably claim that Respondent did not consider the entire course of Hydorn's conduct in deciding what discipline to impose.”).

. For the reasons already set forth, I believe the Board's finding that Detroit News would not have fired Hydorn in the absence of protected concerted activity is likewise not supported by substantial evidence. Accordingly, ■ even assuming the Board's finding of a prima facie case is supported by substantial evidence, I would grant the petition for review. Such a succinct holding would have avoided the mistake I believe the majority has made.